# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JAMES RUSSELL JERRELL,** ) | | |
| Plaintiff ) | | |
| ) | | |
| v. ) | Civil Action No. 2:10cv00072 | |
| ) | | |
| **MICHAEL J. ASTRUE,** ) | **REPORT AND RECOMMENDATION** | |
| **Commissioner of Social Security,** ) | | |
| Defendant ) | BY: PAMELA MEADE SARGENT | |
| ) | United States Magistrate Judge | |

*I. Background and Standard of Review*

Plaintiff, James Russell Jerrell, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jerrell protectively filed his applications for DIB and SSI on July 6, 2007, alleging disability as of January 13, 2007, due to back problems, knee problems and depression.[1] (Record, ("R."), at 67, 108-12, 127.) The claims were denied initially and on reconsideration. (R. at 76-79, 81-85, 89-94.) Jerrell then requested a hearing before an administrative law judge, ("ALJ"). (R. at 95.) A hearing was held on December 12, 2008, at which Jerrell was represented by counsel. (R. at 28-59.)

By decision dated August 4, 2009, the ALJ denied Jerrell's claims. (R. at 67-75.) The ALJ found that Jerrell met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008.[2] (R. at 69.) The ALJ also found that Jerrell had not engaged in substantial gainful activity since January 13, 2007, the alleged onset date. (R. at 69.) The ALJ determined that the medical evidence established that Jerrell had severe impairments, namely osteoarthritis of the left knee (status-post surgery) and degenerative disc disease, but he found that

---

[1] Jerrell does not contest the ALJ's findings regarding his mental impairment. Therefore, medical records pertaining thereto will not be discussed in this Report and Recommendation.

[2] Thus, Jerrell must show disability on or before December 31, 2008, to be eligible for DIB benefits.

-2-

Jerrell's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 69-71.) The ALJ also found that Jerrell had the residual functional capacity to perform light work[3] that required no climbing of ladders, ropes or scaffolds, no more than frequent pushing/pulling with the left lower extremity or balancing, no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching or crawling, no more than occasional operation of foot controls with the left lower extremity, and which allowed for a sit/stand option every 30 minutes. (R. at 72-73.) Thus, the ALJ found that Jerrell was unable to perform any of his past relevant work. (R. at 73.) Based on Jerrell's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Jerrell could perform, including jobs as an office clerk and a retail clerk. (R. at 74.) Thus, the ALJ found that Jerrell was not under a disability as defined under the Act and was not eligible for benefits. (R. at 74-75.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued his decision, Jerrell pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 1-5.) Jerrell then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Jerrell's motion for summary judgment filed May 2, 2011, and the Commissioner's motion for summary judgment filed June 1, 2011.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

## II. Facts

Jerrell was born in 1981, (R. at 108, 111), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2011). He has a high school education with one semester of college instruction. (R. at 33.) Jerrell has past work experience as a janitor, a hospital security guard and a cook/cashier in a fast food restaurant. (R. at 40.) Jerrell testified that he was involved in a motor vehicle accident on January 14, 2007, resulting in a broken knee cap and a compressed spine. (R. at 34, 49.) He testified that he underwent knee surgery in 2007, and he testified that he twisted his knee after his leg gave way in April 2008. (R. at 42, 44, 47.) However, Jerrell testified that he had never received treatment for his back problems. (R. at 42.) He stated that he had presented to two hospital emergency departments where he was told he had stressed his lumbar spine. (R. at 43.) Jerrell explained that x-rays were taken, and he was prescribed pain medication. (R. at 43.) He testified that he experienced constant middle back pain that radiated into his left leg all the way to his foot. (R. at 47-48.) Jerrell testified that he had undergone physical therapy for his knee, but not for his back. (R. at 44-45.) At the time of the hearing, he stated that he was taking only over-the-counter pain medication. (R. at 44.)

Jerrell estimated that he could walk for 15 minutes without interruption and sit for up to 20 minutes without interruption. (R. at 46.) He stated that sitting for long periods made his leg numb. (R. at 46.) Jerrell testified that on bad days, he had to use a cane to walk, and he stated that his left leg gave way at least twice weekly. (R. at 46-47.) Jerrell testified that he saw Dr. Nyunt, a consultative examiner, approximately one year previously for only 15 minutes. (R. at 52.)

Bill Ellis, a vocational expert, also was present and testified at Jerrell's hearing. (R. at 56-58.) Ellis classified Jerrell's past work as a security guard and a cashier as light and his jobs as a janitor and a cook as medium.[4] (R. at 56.) Ellis testified that a hypothetical individual of Jerrell's age, education and work history who could perform light work that required no more than frequent pushing/pulling with the left lower extremity, that did not require climbing ladders, ropes or scaffolds and that required no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching or crawling, could perform Jerrell's past work as a security guard and a cashier. (R. at 57.) Ellis testified that the same hypothetical individual, but who also could not sit for longer than 30 minutes at a time, could not perform any of Jerrell's past work, but could perform the jobs of an office clerk and a retail clerk, both at the light level of exertion. (R. at 57-58.) Ellis further testified that the same individual, but who also could use the left lower extremity for the operation of foot controls occasionally, could perform these same jobs. (R. at 58.) Lastly, Ellis testified that an individual with the limitations as testified to by Jerrell could perform no jobs. (R. at 58.)

In rendering his decision, the ALJ reviewed records from Dr. Sreenivasan Kotay, M.D.; Lee County Health Center; Western Lee County Health Clinic; Dr. Wallace Huff, M.D.; Ilze Sillers, Ph.D., a state agency psychologist; Dr. Tun Nyunt, M.D.; Dr. P. Saranga, M.D., a state agency physician; Dr. Richard L. Gann, M.D., a state agency psychiatrist; Dr. George L. Cross III, M.D., a state agency physician; Dr. Allen Dawson, M.D., a state agency physician; Knox County

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

-5-

Hospital; Dr. Ronald Dubin, M.D.; Dr. Barry Burchett, M.D.; and Cumberland River Comprehensive Care Center. Jerrell's attorney also submitted medical records from Cumberland River Comprehensive Care Center to the Appeals Council.[5]

The record shows that Jerrell was involved in a motor vehicle accident on January 14, 2007. (R. at 348.) X-rays of Jerrell's skull taken the following day were unremarkable. (R. at 348.) A May 5, 2007, MRI of the left knee showed a small amount of joint fluid, but no meniscal tear or other ligamentous tear and no destructive bony lesions or adjacent soft tissue masses. (R. at 343.) On June 20, 2007, Dr. Wallace L. Huff, M.D., performed a left knee arthroscopy with lateral release, chondroplasty of the patella and partial lateral meniscectomy on Jerrell. (R. at 346.) On July 31, 2007, Dr. Huff wrote a letter to the Department for Disability Determination Services stating that Jerrell continued to show some weakness in the knee, mainly of the vastus medialis oblique musculature. (R. at 350.) Dr. Huff further stated that, typically, patients do not achieve maximum medical improvement following the type of knee surgery that Jerrell underwent for four to six months. (R. at 350.) In particular, Dr. Huff noted that Jerrell would have some limits on his ability to do deep knee squats, stooping, bending or crawling. (R. at 350.) However, Dr. Huff opined that these would not be permanent restrictions, but only temporary until Jerrell could complete a course of physical therapy. (R. at 350.) After that, Dr. Huff opined that Jerrell should be

---

[5] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

-6-

Case 2:10-cv-00072-JPJ-PMS   Document 23   Filed 01/06/12   Page 6 of 19   Pageid#: 662

able to return to his regular daily activities with possibly some restrictions on prolonged squatting, bending or crawling. (R. at 350.) He stated that Jerrell would require six to 10 weeks of good physical therapy before he would know the final outcome. (R. at 350.)

Jerrell saw Dr. Tun Nyunt, M.D., for a consultative examination on September 18, 2007. (R. at 366-72.) Dr. Nyunt stated, based on Jerrell's self-reported history, that, due to chronic injury to the back and knee, he could sit for up to 30 minutes, stand for up to 10 minutes, walk for up to 10 minutes and lift items weighing up to 40 to 50 pounds. (R. at 367.) However, Dr. Nyunt opined that Jerrell could not crawl or squat. (R. at 367.) He noted that Jerrell was taking only over-the-counter ibuprofen for pain control. (R. at 368.) Physical examination revealed full motor strength in all extremities except slightly reduced strength in the left knee at 4/5. (R. at 368.) Sensory examination was intact, and Jerrell had normal coordination, but his gait was tilted to the left side. (R. at 368-69.) Jerrell could walk only three to four steps on tandem walk and only three steps while walking on his heels, limping to the right side. (R. at 369.) He was able to get up from a chair and get onto the exam table without any assistance or difficulty. (R. at 369.) He had stiffness and tenderness of his left knee joint and lower lumbar area. (R. at 369.) Jerrell had normal range of motion of the upper extremities and flexion/extension of the lumbar spine to 70 degrees. (R. at 369.) He had range of motion to 120 degrees in the left knee joint and to 150 degrees in the right knee joint. (R. at 369.) Sitting straight leg raise testing was at 90 degrees bilaterally. (R. at 369.) Supine straight leg raise testing was at 80 degrees on the right and 45 degrees on the left. (R. at 369.) Jerrell had full muscle strength in the right lower extremity, but slightly reduced muscle strength in the left lower

-7-

extremity at 4/5. (R. at 369.) Dr. Nyunt diagnosed chronic lumbar radiculopathy and chronic left knee pain with recurrent patella dislocation, status-post arthroscopic surgery. (R. at 369.) He recommended an MRI of the lumbar spine and a reevaluation of Jerrell's knee problem to determine the extent of his impairment. (R. at 369.)

On October 27, 2007, Dr. P. Saranga, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Jerrell, finding that he could perform light work with an ability to frequently push/pull with the left leg for the operation of foot controls. (R. at 373-80.) Dr. Saranga also opined that Jerrell could frequently balance, occasionally climb ramps and stairs, stoop, kneel, crouch and crawl and never climb ladders, ropes and scaffolds. (R. at 375.) Dr. Saranga imposed no manipulative, visual, communicative or environmental limitations. (R. at 376-77.) Dr. Saragna gave Dr. Nyunt's opinion little weight because he found that his findings were not supported by his own examination. (R. at 379.) Dr. Saranga gave the opinion of Dr. Wallace that Jerrell's restrictions against deep squatting, stooping, bending and crawling for four to six months were temporary and would improve with physical therapy, great weight. (R. at 379.) On November 15, 2007, Dr. George L. Cross III, M.D., another state agency physician, concurred with Dr. Saranga's findings. (R. at 384-85.)

On February 20, 2008, Dr. Allen Dawson, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment of Jerrell, finding that he could perform light work with an ability to frequently use

the left leg for pushing and pulling, including the operation of foot controls.[6] (R. at 386-93.) Dr. Dawson further found that Jerrell could frequently balance, occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 388.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 389-90.)

On April 22, 2008, Jerrell presented to the emergency department at Knox County Hospital after twisting his left knee. (R. at 396-406.) He was diagnosed with recurrent internal derangement of the left knee. (R. at 397.) Jerrell was prescribed Ultram and was given a knee brace. (R. at 397.) He was advised to follow-up with Dr. Huff as soon as possible. (R. at 397, 403.)

An August 20, 2008, MRI of Jerrell's lumbar spine showed a transitional L6 lumbosacral vertebral body; multilevel disc desiccation and end plate irregularities; mild multilevel disc bulging; and a one centimeter left L5-L6 paracentral disc herniation severely effacing the left S1 nerve root in the lateral recess. (R. at 449.)

On August 25, 2008, Jerrell saw Dr. Ronald S. Dubin, M.D., an orthopedist. (R. at 425.) Dr. Dubin read the MRI scan of Jerrell's lumbar spine and opined that Jerrell would require surgical treatment. (R. at 425.) He stated that he would refer him at Jerrell's request. (R. at 425.)

On February 17, 2009, Jerrell saw Dr. Barry Burchett, M.D., for a

---

[6] Although Dr. Dawson did not explicitly state that Jerrell could frequently use the lower extremities for pushing/pulling, he stated that there was no evidence on reconsideration review to alter the prior assessment, in which this was found by Dr. Saranga. (R. at 387.)

consultative examination of his back and knee impairment. (R. at 436-41.) Jerrell stated that he took only Motrin for pain. (R. at 436.) Dr. Burchett noted that Jerrell walked with a normal gait, which was not unsteady, lurching or unpredictable. (R. at 437.) Jerrell did not require the use of a handheld assistive device inside the house, although he used a cane sometimes when walking about outside. (R. at 437.) Jerrell appeared stable at station and comfortable in the supine and sitting positions. (R. at 437.) Physical examination of Jerrell's legs showed no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet. (R. at 438.) There was no calf tenderness, redness, warmth, cord sign or Homan's sign. (R. at 438.) There was no evidence of tenderness over the spinous processes of the cervical spine, and there was no evidence of paravertebral muscle spasm. (R. at 439.) Examination of the dorsolumbar spine revealed normal curvature, no evidence of paravertebral muscle spasm and no tenderness to percussion of the dorsolumbar spinous processes. (R. at 439.) Straight leg raise testing was negative in both the sitting and supine positions. (R. at 439.) Jerrell was able to stand on one leg at a time without difficulty, and there was no discrepancy in leg length. (R. at 439.) There was no hip joint tenderness, redness, warmth, swelling or crepitus. (R. at 439.) Jerrell's cranial nerves were intact, and there was no atrophy noted. (R. at 439.) Sensory modality of light touch sensation was diminished subjectively down the entire left lower extremity. (R. at 439.) The biceps, triceps, brachioradialis, patellar and Achilles deep tendon reflexes were symmetrical and graded normally at +3/4 bilaterally. (R. at 439.) Hoffmann's and Babinski's signs were negative. (R. at 439.) There was no clonus, and cerebellar function was intact. (R. at 439.) Jerrell was able to walk on the heels and toes, and he could perform tandem gait and squat without difficulty. (R. at 439.) Dr. Burchett diagnosed chronic low back pain with radiculopathy in

-10-

the left lower extremity and osteoarthritis of the left knee, status-post arthroscopy. (R. at 439.) He noted that Jerrell's symptoms of chronic low back pain and radicular symptoms into the left lower extremity were consistent with the August 2008 MRI revealing effacement of the left S1 nerve root. (R. at 439.) Dr. Burchett noted that Jerrell's range of motion of the spine was normal, deep tendon reflexes were brisk and symmetrical, there was no significant spasm or tenderness in the back, and motor strength was normal in both lower extremities. (R. at 439.)

Dr. Burchett also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), finding that Jerrell could continuously lift items weighing up to 50 pounds and occasionally lift items weighing up to 100 pounds. (R. at 442-47.) He found that Jerrell could carry items weighing up to 20 pounds continuously and up to 50 pounds occasionally, but never more than 50 pounds. (R. at 442.) Dr. Burchett opined that Jerrell could sit, stand and/or walk for 20 minutes without interruption, that he could sit for a total of six hours in an eight-hour workday and that he could stand and/or walk for a total of two hours in an eight-hour workday. (R. at 443.) Dr. Burchett noted that Jerrell required a cane to walk more than 200 feet and that the use of a cane was medically necessary, but he could use his free hand to carry small objects. (R. at 443.) Dr. Burchett further opined that Jerrell could continuously use both hands for reaching, handling, fingering, feeling and pushing/pulling objects. (R. at 444.) Dr. Burchett found that Jerrell could occasionally use his right foot for the operation of foot controls, but never the left foot. (R. at 444.) Dr. Burchett further found that Jerrell could occasionally balance, but never climb, stoop, kneel, crouch or crawl. (R. at 445.) He noted that Jerrell had decreased visual acuity which prevented him from reading very small print. (R. at 445.) Dr. Burchett opined that Jerrell could

continuously work at unprotected heights, around moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, in temperature extremes and around vibrations. (R. at 446.) He found that Jerrell could operate a motor vehicle, but not at night, and that he could work around very loud noise. (R. at 446.) Dr. Burchett also found that Jerrell could shop, travel without a companion for assistance, ambulate without using a wheelchair, walker or two canes or two crutches, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single handrail, prepare simple meals and feed himself, care for personal hygiene and sort, handle and use paper/files. (R. at 447.) Lastly, Dr. Burchett concluded that these limitations had lasted or would last for 12 consecutive months. (R. at 447.)

Jerrell returned to Dr. Dubin on February 27, 2009, reporting continued back pain. (R. at 451.) Dr. Dubin noted that surgery had been recommended the previous month, and he referred him to Dr. Brooks. (R. at 451.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§

404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Jerrell argues that the ALJ erred by failing to find that his back impairment met the listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. (James Jerrell's Brief In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Jerrell also argues that the ALJ erred by failing to even mention Dr. Nyunt's opinion and failing to explain why he accorded greater weight to the opinion of Dr. Burchett. (Plaintiff's Brief at 7-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by

-13-

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Jerrell argues that the ALJ erred by failing to find that his back impairment met the requirements of § 1.04(A). (Plaintiff's Brief at 5-7.) Based on my review of the record, I do not find this argument persuasive. Section 1.04 contains three subsections. The introductory paragraph to § 1.04 requires a claimant to show the following for all of the subsections: a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2011). Additionally, to meet the requirements of § 1.04(A), a claimant must show evidence of nerve root compression characterized by neuro-anatomic distribution

-14-

of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raise testing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2011). It is well-settled that a claimant must prove that he meets *all* of the requirements of a listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). For the following reasons, I find that substantial evidence supports the ALJ's finding that Jerrell's back impairment does not meet the requirements of § 1.04(A).

There is evidence in the record that Jerrell suffers from a herniated nucleus pulposus at the L5-6 level of the lumbar spine severely effacing the left S1 nerve root in the lateral recess. The record also shows that Jerrell has neuro-anatomic distribution of pain. However, the record shows that Jerrell's impairment does not meet the remaining requirements, as mandated by *Sullivan*. First, I find that the record does not show limitation of motion of the spine. The September 18, 2007, examination by Dr. Nyunt revealed flexion/extension of the lumbar spine to 70 degrees. (R. at 369.) This is considered normal.[7] At the February 17, 2009, examination by Dr. Burchett, Jerrell again had normal range of motion of the spine. (R. at 439.) Even if Jerrell could show limitation of motion of the lumbar spine, he still cannot show motor loss accompanied by sensory or reflex loss. Specifically, Dr. Nyunt's examination showed some slightly reduced strength in the left knee and left lower extremity, but sensory examination was intact. (R. at 368-69.) While Dr. Burchett noted some diminished light touch sensation down the left lower extremity, he specifically noted that this was based on Jerrell's

---

[7] Sixty degrees for flexion is considered normal range of motion for the lumbar spine, and 25 degrees for extension is considered normal. *See* http://www.chiro.org/forms/romchiro.html (last visited Jan. 5, 2012).

subjective report, not objective testing. (R. at 439.) Dr. Burchett further found that Jerrell's deep tendon reflexes were "brisk and symmetrical," and motor strength was normal. (R. at 439.) Finally, because Jerrell's back impairment involves the lumbar spine, he also must show positive straight leg raise testing. Although supine straight leg raise testing on the left was only 45 degrees at the time of Dr. Nyunt's examination, it was negative by the time of Dr. Burchett's examination. Thus, it appears that Jerrell's symptoms improved between the two examinations. As Jerrell's back impairment was not treated during this time, it is not likely that his symptoms would improve if they were due to his back impairment. Instead, it is more likely that Jerrell's positive straight leg raise testing on the left at the time of Dr. Nyunt's examination was due to his left knee surgery, which was performed only approximately three months previously, and which Dr. Huff opined would take four to six months from which to achieve maximum medical improvement. (R. at 350.)

It is for all of these reasons I find that substantial evidence supports the ALJ's finding that Jerrell's back impairment does not meet the requirements of § 1.04(A).

Jerrell also argues that the ALJ erred by failing to explain why he gave weight to Dr. Burchett's opinion, but did not even cite Dr. Nyunt's opinion, in making his decision. I find this argument unpersuasive. The ALJ discussed both Dr. Burchett's and Dr. Nyunt's opinions in reaching his decision. In particular, the ALJ stated that Dr. Nyunt's opinions regarding Jerrell's restrictions appeared to be based on Jerrell's self-reported limitations. (R. at 73.) The ALJ further stated that Dr. Nyunt's examination did not support such restrictions and was inconsistent

-16-

with the objective medical evidence of record, as well as the findings and conclusions of other treating and examining sources. (R. at 73.) The ALJ stated that it was for these reasons that he gave Dr. Nyunt's opinion little weight. (R. at 73.) This being the case, I find Jerrell's argument that the ALJ failed to even cite Dr. Nyunt's opinion incorrect. I further find that the ALJ sufficiently explained why he was according this opinion little weight.

Likewise, the ALJ discussed Dr. Burchett's objective findings. (R. at 70-73.) As noted by the Commissioner, Dr. Burchett had the benefit of reviewing an MRI of Jerrell's lumbar spine. (R. at 71, 369, 436.) Additionally, at the time Dr. Burchett evaluated Jerrell, approximately 20 months had elapsed since his knee surgery. (R. at 346-47, 436.) The ALJ stated that his finding regarding Jerrell's residual functional capacity was "consistent with, and actually more restricted than" Dr. Burchett's opinion. (R. at 73.) All of this being said, I find unpersuasive Jerrell's argument that the ALJ failed to explain why he gave more weight to Dr. Burchett's opinion over that of Dr. Nyunt.

Based on the reasoning stated above, I find that Jerrell is incorrect that the ALJ failed to even cite Dr. Nyunt's opinion and that he sufficiently explained why he accorded more weight to Dr. Burchett's opinion.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

-17-

1. Substantial evidence exists to support the Commissioner's finding that Jerrell's back impairment did not meet the requirements of the medical listing for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A);

2. Substantial evidence exists to support the Commissioner's weighing of the evidence; and

3. Substantial evidence exists to support the Commissioner's finding that Jerrell was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Jerrell's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The

judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: January 6, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE